IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANITA MARTINEZ                    )
                                  )
                  Plaintiff,      )        No.  08 C 3037
                                  )
            v.                    )        Hon. Michael T. Mason
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security   )
                                  )
                  Defendant.      )

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge.

Plaintiff Anita Martinez ("Martinez" or "claimant") filed a motion for summary

judgment seeking judicial review of the final decision of the Commissioner of Social

Security (the "Commissioner") denying her claim for Supplemental Security Income

("SSI") benefits pursuant to 42 U.S.C. §§ 416(i), 423(d) and 1382.  The Commissioner

filed a cross motion for summary judgment asking this Court to uphold the decision of

the Administrative Law Judge ("ALJ").  We have jurisdiction to hear this matter pursuant

to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons set forth below, the

Commissioner's motion for summary judgment is granted and Martinez's motion is

denied.

## I.    PROCEDURAL HISTORY

Martinez filed an application for benefits on September 8, 2004.  (R. 66-69).  In

that application, Martinez alleged a disability due to manic depression, rheumatoid

arthritis and fibromyalgia with an onset date of December 30, 2003.  (R. 35, 66).  The

Social Security Administration denied her claim initially and again upon reconsideration.

(R. 32-41).  Martinez filed a timely request for a hearing to review the denial of her claim.  (R. 31).  ALJ Alice Jordan ("ALJ Jordan") presided over that hearing on October 16, 2007.  (R. 378-424).  On October 31, 2007, the ALJ issued a decision concluding that Martinez was not disabled and denying her request for benefits.  (R. 16-23).  Martinez then filed a timely request for review.  (R. 10-12).  On March 27, 2008, the Appeals Council denied that request and ALJ Jordan's decision became the final decision of the Commissioner.  (R. 4-6); *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

## II.    BACKGROUND

### A.    Medical History

Claimant submitted medical records from 1996 to 2007[1] in support of her claim for SSI benefits.  (R. 137-371).  On April 15, 1996, Martinez presented to Holy Cross Hospital ("Holy Cross") after a prescription drug overdose.  (R. 155).  The same day, Dr. Christine Aruguete ("Dr. Aruguete"), Martinez's primary care physician, ordered a psychiatric consultation.  (*Id.*).  On April 23, 1996, a registered nurse performed a "social service psychiatry and substance abuse assessment."  (R. 146-50).  The nurse found claimant's overdose to be "reactive to overwhelming stress" associated with caring for her two small children and the recent birth of her third child.  (R. 147).  During the assessment, claimant reported a prior suicide attempt, at age fifteen, when she slit

---

[1]Claimant's alleged onset date is December 30, 2003.  (R. 35).  As discussed below, Martinez argues in her summary judgment brief that the "medical records that pre-date the application, as well as the alleged onset of disability date . . . . have limited relevance to the issues" before this Court.  Nevertheless, to the extent those records are relevant to the ALJ's decision and/or illuminate claimant's condition, they are summarized here.

her wrists "for attention."  (R. 146)

On September 27, 1998, Martinez arrived at Advocate Christ Hospital and Medical Center ("Christ Hospital") and reported bilateral ear pain, an inability to chew or swallow and radiating pain in the jaw and neck.  (R. 137-39).  The attending physician noted Martinez's history of depression and use of Prozac.  (*Id.*).  Martinez returned to Christ Hospital on October 26, 2000, complaining of a sharp and aching pain in her neck.  (R. 164-66).  Treatment records indicate that Martinez was "pregnant and refuse[d] any x rays."  (R. 165).

Dr. Charles Alston ("Dr. Alston") delivered claimant's fifth child on June 11, 2001.  (R. 156-61).  Approximately six weeks later, on July 26, 2001, Martinez returned to Christ Hospital and reported complications from a tubal ligation performed the previous week.  (R. 162-63).  An attending physician noted mild tenderness in claimant's abdomen, diagnosed cellulitis, and ordered claimant to follow up with Dr. Alston within 24-48 hours.  (R. 163).

On February 4, 2002, Martinez received treatment at Christ Hospital after overdosing on Vicodin and Flexeril.  (R. 167-77).  An attending physician noted that claimant suffered from "chronic depression" that "has usually been worse in the post-partum period."  (R. 173).  Claimant voluntarily admitted herself for psychiatric treatment.  (R. 169).  On or around February 5, 2002, Dr. Piyush C. Buch ("Dr. Buch") performed a psychiatric assessment based on the Diagnostic and Statistical Manual of Mental Disorders (the "DSM-IV") (R. 171-72).  During that assessment, Martinez expressed feelings of depression; described thoughts of suicide, helplessness, and hopelessness; and reported a history of depression in her extended family.  (R. 171).

3

Claimant stated that "this is her third overdose . . . she has been living with her five children and she is feeling very stressed out, feeling that life is not worth living." (*Id.*). Dr. Buch diagnosed recurrent major depression, noted the acute conditions of Vicodin and Paxil overdose and chronic back pain, and assigned Martinez an Axis V Global Assessment of Functioning ("GAF") score of 30. (R. 171). The doctor elected to treat Martinez with individual psychotherapy and Effexor XR. (R. 172).

Dr. Nenita R. Irabagon ("Dr. Irabagon") completed a medical history and physical examination of claimant on June 18, 2003. (R. 210-12, 226). During Dr. Irabagon's exam, Martinez recalled that she had an intrauterine device ("IUD") set in place in 1998. (R. 210). Claimant stated that she underwent a vaginal hysterectomy on April 18, 2003 at St. James Hospital in Chicago Heights for chronic prolonged and heavy menses, and claimed that "her ovaries were not removed during the hysterectomy." (*Id.*). Dr. Irabagon diagnosed "controlled" depression, abdominal and rectal pain, chromic anemia secondary to prolonged heavy menstrual periods, and a retained IUD. (R. 212).

Also on that date, Dr. Sam F. Flosi ("Dr. Flosi") performed a surgery consultation. (R. 225-27). He noted a "lost IUD" and recommended a laparoscopy. (R. 227). According to the reviewing radiologist, a June 18, 2003 x-ray of claimant's abdomen revealed a contraceptive device in the lower abdomen at S1 "which appears to be high positioned in relation to the expected location of the uterus." (*Id.*). Dr. Flosi performed an open laparoscopy on June 19, 2003. (R. 213-14). According to his report, the laparoscopy showed that "perhaps an [IUD] was noted, however, it was uncertain." (R. 214). After consulting with Dr. Barbara Krueger ("Dr. Krueger"), a general surgeon, Dr. Flosi ordered an exploratory laparotomy of claimant's pelvis. (R. 214).

4

Dr. Krueger performed the laparotomy on June 19, 2003. (R. 215-16). Dr. Krueger's exam showed no evidence of the IUD in the pelvis, beneath or behind the ovaries. (R. 215-16). However, an exploration of the abdomen revealed the IUD "encased in the very distal aspect of the omentum." (R. 216). After removing the IUD, Dr. Krueger discharged Martinez with prescriptions for Vicodin and Motrin. (R. 209).

Martinez returned to the emergency department at Christ Hospital on July 15, 2003, complaining of persistent pelvic pain over the past three days. (R. 188-96). The attending physician noted that claimant's abdomen was slightly tender over the lower left quadrant. (R. 189). Claimant received a CT scan of her pelvis on July 16, 2003, and a second CT scan and ultrasound of her pelvis on July 18, 2003. (R. 270-74). The physician who reviewed the CT scans determined that the "tubular fluid filled structure seen in the examination on 7/16 [wa]s significantly smaller in the [7/18] study." (R. 270). He found a "suggestion of a boggy mass in the pelvis," but no distinct abscess. (*Id.*). A second physician reviewed the ultrasound and noted a "somewhat ill-defined hypoechoic area probably adjacent to the left ovary" of "unclear" significance. (R. 271).

Dr. Jeffrey H. Port ("Dr. Port") provided a gastroenterology consultation on July 20, 2003. (R. 278-79). He described Martinez as a "30-year-old-woman with [a] long complicated mental history" and "status post hysterectomy because of irregular menstrual periods," who "is now being evaluated for recurrent episodes of abdominal pain." (R. 278). During Dr. Port's examination, claimant reported two kinds of pain, a "vague pain in the left lower quadrant . . . associated with movement" and "a pain in the rectum" that precedes and follows bowel movements. (*Id.*). Dr. Port performed a colonoscopy with biopsy on August 16, 2003. (R. 181-82). That procedure revealed a

5

"[i]rritable, spastic colon without mucosal abnormalities."  (R. 181).  Dr. Port concluded

that Martinez "appears to have irritable, spastic colon," and recommended mild

antispasmodic agents and/or mild antidepressants to relieve her pain.  (R. 182).  The

biopsy did not reveal any malignancy, and the reviewing physician noted a post-

operative diagnosis of hemorrhoids.  (R. 180).

On February 17, 2004, Martinez received treatment from Dr. Robert J. Andina

("Dr. Andina"), one of Dr. Aruguete's partners.  (R. 337).  Claimant reported  bone and

joint pain in her shoulders, hands and left leg, which had been present for the last three

months.  (*Id.*).  Martinez stated that she managed her pain with Aleve.  (*Id.*).  Dr. Andina

recommended an x-ray of the lumbar spine.  (*Id.*).  According to the reviewing

radiologist, that x-ray revealed a "normal lumbar spine" with no fracture, dislocation or

other abnormality.  (*Id.*).

Martinez then sought treatment from Dr. Daniel J. Hirsen ("Dr. Hirsen"), a

rheumatologist.  (R. 243-48).  In a March 10, 2004 letter to Dr. Aruguete, Dr. Hirsen

noted claimant's report of morning stiffness lasting two hours, a history of major

depression, and a family history of rheumatoid arthritis.  (R. 243).  Dr. Hirsen described

claimant's general physical exam as "normal."  (R. 244).  His exam showed "a question

of trace swelling in the MCP and PIP joints of the hands," and that claimant's hips were

"painful anteriorly on rotation"  (*Id.*).  The doctor observed "very subtle yet definite

evidence of a true inflammatory process," which he termed "inflammatory polyarthritis."

(*Id.*).  Dr. Hirsen opined that claimant's condition was "not well developed enough to

label as seronegative rheumatoid arthritis," and prescribed Plaquenil, a "very benign

long-acting anti-inflammatory drug, for daily use."  (*Id.*).

6

Martinez returned to Dr. Aruguete on March 16, 2004, and reported two recent

falls due to a loss of sensation in her right leg. (R. 336). Dr. Aruguete noted a "normal

examination" and diagnosed arthralgia. (*Id.*). Martinez sought treatment from the

emergency department of St. Mary's Hospital ("St. Mary's") on August 8, 2004 after she

fell down the stairs and injured her right ankle. (R. 251-57). An x-ray revealed no

definitive acute fracture or other bony abnormality. (R. 255-56).

On August 27, 2004, claimant underwent a magnetic resonance imaging ("MRI")

and magnetic resonance angiography ("MRA") study of her brain. (R. 249-50).

Claimant's clinical history indicates that the purpose of the exam was to "rule out

multiple sclerosis." (R. 250). According to the reviewing radiologist, the "essentially

negative" MRI revealed only an "incidental note . . . of mild mucosal thickening involving

maxillary sinuses bilaterally." (R. 249). He also described the MRA as "essentially

negative." (R. 250).

Martinez returned to Dr. Aruguete on November 1, 2004, seeking treatment for

pain in her left hip and knee, both ankles and right shoulder. (R. 335). Martinez

reported "trouble sleeping" due to the pain. (*Id.*). She had stopped taking Plaquenil due

the side effects of blurred vision, nausea, and abdominal pain. (*Id.*). Dr. Aruguete

noted claimant's depression and arthritis, and prescribed Naprosyn for pain,

inflammation and stiffness. (*Id.*). In a November 9, 2004 letter to the "Illinois Office of

Rehab Services Disability Determination," Dr. Aruguete stated that claimant "has been

under [her] medical care intermittently since 1996," and currently has "severe

arthralgia[], both at rest and on minimal exertion." (R. 334). The doctor relayed

Martinez's claim of "pain during the night" and an inability to function "due to her

discomfort." (*Id.*). Finally, Dr. Aruguete noted that claimant "was advised to follow-up with her Rheumatologist, since she was unable to tolerate Plaquenil." (*Id.*).

Claimant's medical records also include the narrative results of a psychological examination performed by Erwin J. Baukus ("Dr. Baukus"), a licensed clinical psychologist, on December 16, 2004 and authorized by the Bureau of Disability Determination Services ("DDS"). (R. 280-84). Dr. Baukus examined claimant for 1.1 hours and reviewed her medical records. (R. 280). He observed that claimant drove herself to the examination and that her "balance, gait, and gross motor functioning were unremarkable." (*Id.*). Dr. Baukus noted Martinez's current medication: Seroquel, Effexor XR, generic Naprosyn, generic Colace, and generic Motrin. (R. 282).

During the exam, claimant reported "depressive symptoms" of sleep disturbance (delayed onset), decreased energy, feelings of worthlessness, difficulty concentrating and thinking, and thoughts of suicide. (*Id.*). Martinez also stated that she "independently takes care of her activities of daily living such as toileting, washing and personal hygiene," and "takes care of her children." (*Id.*). Finally, Martinez stated that she regularly attends church, takes care of chores around the apartment, does her own grocery shopping, and "gets around the neighborhood by walking, driving, and having others give her a ride." (*Id.*).

Dr. Baukus observed that claimant's affect, which he defined as the "emotional tone underlying her observed behavior," was "stable" and her mood "euthymic (normal range - absence of depressed or elevated mood)." (R. 283). Based on the clinical examination and his review of the available medical records, Dr. Baukus diagnosed Martinez with "chronic depression in partial remission with psychiatric treatment." (R.

284).

Leslie Fyans ("Dr. Fyans"), a state agency psychologist, performed a psychiatric review of claimant on February 16, 2005. (R. 306-19). Dr. Fyans found that Martinez had "mild" restriction of her daily living activities and difficulty in maintaining social functioning, concentration and persistence. (R. 316). The doctor opined that claimant's impairments were not severe, and that the supporting medical documentation did not establish the presence of the "C" criteria of Listing 12.04 for affective disorders. (R. 306, 317). Dr. Fyans concluded that "claimant has depression which is in rem[iss]ion with treatment." (R. 318).

Martinez returned to Dr. Aruguete on April 5, 2005 and reported migraine headaches, "constant" left hip pain and back pain. (R. 333). Dr. Aruguete noted a "slight swelling" in claimant's fingers, and diagnosed migraines and joint pain. (*Id.*).

DDS psychologist Linda Lanier ("Dr. Lanier") reviewed claimant's medical records and completed a psychiatric review on May 20, 2005. (R. 288-301). She noted claimant's prior "psych" hospitalizations and current medication of Seroquel and Effexor. (R. 300). Dr. Lanier's notes also indicate "no counseling." (*Id.*). She opined that Martinez had a "mild" restriction of her daily living activities and "moderate" difficulty maintaining concentration, persistence, and/or pace. (R. 298). She concluded that claimant's medical evidence did not establish the presence of the "C" criteria of Listing 12.04 for affective disorders, and recommended a residual functional capacity ("RFC") assessment. (R. 288, 299).

Also, on that date, Dr. Lanier performed a mental RFC assessment. (R. 302-05). Dr. Lanier concluded that claimant's understanding and memory were "not significantly

9

limited," and that claimant had no significant limitations with social interaction and adaptation. (R. 302-03). The doctor determined that claimant's abilities to sustain concentration and persistence, to carry out detailed instructions, and to maintain attention and concentration for extended periods of time were "moderately limited." (R. 302-03). She found claimant's abilities to carry out short and simple instructions, sustain ordinary routine, make simple work-related decisions, perform activities within a schedule, and maintain regular attendance were not significantly limited. (R. 302). Dr. Lanier concluded that claimant "retains the ability to understand, remember, and carry out at least one and two step directions," and "is capable of s[ubstantial] g[ainful] a[ctivity]." (R. 304).

Claimant sought treatment from Dr. Aruguete on August 12, 2005, and reported pain in both hands and knees and in her left hip. (R. 332). Martinez informed her primary care physician that she planned to "see Dr. Hirsen again." (*Id.*). Dr. Aruguete diagnosed arthritis and depression, and referred claimant to "rheumatology/psych." (*Id.*). Dr. Aruguete repeated this referral on December 13, 2005. (R. 330).

Martinez received treatment at Christ Hospital on January 10, 2006, following a motor vehicle accident. (R.320-23). The attending emergency physician diagnosed left trapezius pain. (R. 322). Claimant, who was alert and orientated, reported a pain level of "0" at that time. (*Id.*). Five months later, on June 1, 2006, Martinez presented to Dr. Aruguete with complaints of sleeplessness, a lack of energy and leg pain. (R. 328). The doctor diagnosed chronic fatigue syndrome. (*Id.*).

On April 13, 2007, Dr. Philomena Francis ("Dr. Francis") performed a complete

physical examination of claimant.  (R. 365-67).[2]  During the examination, Martinez reported that she had "not been taking any meds," was depressed with daily suicidal thoughts, and had been "manic last 4 months."  (R. 365).  Claimant also reported "painful wrists and tightness of fingers" and "flexion of fingers limited slightly."  (R. 366).  Dr. Francis noted depression, bipolar disorder, arthritis and abnormally high blood pressure.  (R. 367).

Martinez returned to Dr. Francis on September 1, 2007.  (R. 362-64).  Claimant reported continued depression, and stated that she last attempted suicide six months ago.  (R. 364).  She also reported "pain: legs, hips, shoulders . . . thinks it may be fibromyalgia."  (R. 362).  Dr. Francis diagnosed musculoskeletal pain and "known bipolar disorder, not suicidal at this time."  (R. 36364).  In response to Martinez's complaints of tenderness along the vaginal wall, Dr. Francis recommended a pelvic ultrasound.  (*Id.*).

Martinez returned for further treatment on September 26, 2007.  (R. 359-61).  Claimant stated that she felt like the "walking dead" but now "feels better; the Cymbalta is working."  (R. 359).  Claimant also reported "frequent" swelling in "different joints at different times."  (*Id.*).  Dr. Francis performed a straight leg raise test which was negative, and did not find any deformities, tenderness or dislocations in claimant's upper or lower extremities.  (R. 360).  The doctor diagnosed "muscoskeletal pain - severe," bipolar disorder, "depression responding to [treatment]," bilateral carpal tunnel syndrome and "sleep disorder - controlled."  (R. 361).  Dr. Francis prescribed extensor

---

[2]In her summary judgment brief, Martinez explains that she began treatment with Dr. Francis after Dr. Aruguete retired.

splints for both wrists, recommended stretching exercises, and continued claimant's prescription for Cymbalta.  (*Id.*).

### B.    Claimant's Testimony

Martinez appeared with counsel and testified at the October 16, 2007 hearing. (R. 382-414).  Claimant is 5'5'' and, as of the hearing date, weighed 187 pounds.  (R. 382).  She is married to, but does not reside with, Samuel Cisneros.  (R. 382-83). Martinez lives with her five children in the basement apartment of her mother's home in Streator, Illinois.  (R. 383).  At the time of the hearing, claimant's children were 16, 14, 11, 9, and 6 years old.  (*Id.*).  The family's apartment consists of two bedrooms, a living room, dining room, and bathroom.  (*Id.*).  There is one flight of stairs.  (R. 384).

Martinez currently receives public aid.  (R. 384).  Her income "is based on child support received from the father for the children."  (*Id.*).  Martinez completed one year of technical college and received a certificate in administrative assistance.  (R. 385).  She has no other vocational training.  (*Id.*).

Claimant last worked as a car wash attendant for approximately three months at Super Wash.  (R. 385-86, 409).  That job involved "selling tokens to customers . . . [performing] maintenance for the water, washing down the carport . . . filling vending machines, and handling cash."  (R. 386).  According to Martinez, "90 percent of the job required standing as well as climbing ladders, lifting heavy objects, and things that were difficult for [her]."  (*Id.*).  Claimant further explained that the lifting included "fifty to 60 to 75 pound bags of coins, quarters."  (*Id.*).  Martinez terminated her employment at Super Wash on December 30, 2003 because the "standing was becoming difficult," and she was in "so much pain working at that job."  (R. 408).  She tried her "hardest" and "did

12

everything [she] could possibly do," but found her "conditions were worsening," and "[i]t was becoming more and more difficult . . . to get up in the morning and go to work." (*Id.*).

Prior to her job as a car wash attendant, claimant worked for "Stickney Township" for approximately six months. (R. 417). She was also employed as a sandwich maker at McDonalds for a year and a half. (R. 417-18). Martinez has not applied for any job since leaving Super Wash. (R. 386). She explained that this is because she suffers from severe depression and finds it difficult to focus. (*Id.*). Claimant stated that her "mind races constantly," she forgets things, and has a "difficult time remaining on task." (R. 387).

On an average day, Martinez wakes up at seven to "make sure that the children are dressed, and teeth are brushed, and fed breakfast, and see them off to school." (R. 389). Then, claimant "may lay down . . . for an hour or two" before she can attempt household chores. (*Id.*). Typically, claimant naps about five days per week. (R. 412). After her nap, Martinez "will try to do laundry, and clean and sweep the house, and [do] things that won't require bending or lifting." (R. 389). Martinez stated that she cannot lift more than "about" twenty pounds. (R. 396). Claimant prepares dinner for her children, and assists them with their homework. (R. 389-90). Martinez acknowledged that she is "able to take care of [her] own personal hygiene." (R. 392).

Martinez visits her mother two to three times a week. (R. 390-91). Claimant's mother accompanies her to the grocery store and other stores such as Wal-Mart and Target once every two or three months. (R. 391). Martinez stated that she last drove approximately one month ago, and generally doesn't drive because it "hurts [her]

13

hands." (R. 391). She tries to walk a mile outdoors twice a week, for exercise. (R. 393). Claimant can sit for two hours at a time, and stand for about an hour and a half. (R. 396). She has problems with stairs, and therefore won't "go up them very often." (R. 397).

Martinez testified that she suffers from "severe depression, and there is a very large portion of [her] life that makes it incapable for [her] to focus." (R. 386). She described herself as "suicidal on a daily basis." (R. 387). Claimant has experienced suicidal thoughts and tendencies since the age of fifteen. (*Id.*). Martinez made three suicide attempts, the first at age fifteen when she slit her wrists. (*Id.*). The other two involved overdoses of medication. (R. 387-88). According to Martinez, Cymbalta has "minimized" her suicidal thoughts. (R. 403). "Instead of having 10 to 12 suicidal thoughts in a day . . . it decrease[d] to about two a day. . . . which in some degree prevents [her] from acting out on the suicidal thoughts." (R. 403).

Claimant believes that her depression is "genetic." (R. 394). At the time of the hearing, Martinez was not receiving counseling for her depression, and had not attended counseling since "late 2003." (R. 394). She explained that her psychiatrist relocated out-of-state without providing a referral, and it is difficult to find a psychiatrist that will take public aid insurance. (*Id.*). Claimant testified that she has been "on a waiting list at the University of Illinois at Chicago to see an adult psychiatrist" for a year and a half. (R. 394-95).

Martinez has severe migraines three times a year. (R. 412). At those times, claimant feels like "blowing her brains out," is unable to see, and vomits. (R. 412-13). She explained that sitting in "a quiet room, a dark room and no light" is the only thing

that helps her cope with the pain.  (R. 413).  Claimant also suffers from insomnia.  (R. 387-88).  She "ha[s] two to four days without sleep" and then will "crash and . . . [be] in bed for three days."  (R. 388).

At the time of the hearing, Martinez's hands had been "really bad for the past three weeks."  (R. 404).  She explained that "[i]n the morning they are swollen" and she is "unable to open and close them, lift anything, [or] open anything."  (*Id.*).  According to claimant, it takes "about two to three hours for the swelling to go down," before she can "move [her] hands and start to do things."  (*Id.*).  The swelling makes it "hard" for Martinez to begin her daily routine.  (*Id.*)  Martinez stated that she suffers from pain in her shoulders, hips and knees, and on the bottom of her feet.  (R. 388).  She described a repeating cycle that begins with a "sharp shooting" consistent pain that lasts from two to three days, followed by a week or two of mild pain.  (*Id.*).  This pain makes it difficult for her to walk, sit, or stand for extended periods.  (*Id.*).  Martinez's pain makes it "difficult to sleep . . . at least three to four times a week."  (*Id.*).

### C.    Vocational Expert Testimony

Dennis Gustafson ("VE Gustafson") testified as the vocational expert at the October 16, 2007 hearing.  (R. 414-23).  VE Gustafson opined that Martinez's overall past employment included "no significant skill development."  (R. 415).  He described Martinez's past work as a "fast foods worker, light.  Sandwich maker, medium.  Companion, light.  Car wash attendant automatic, that is normally light."  (*Id.*).

ALJ Jordan asked VE Gustafson whether the following hypothetical person would be able to perform claimant's past relevant work: 34 years of age, with a high school education, one year of technical college with an administrative assistant certificate and

the same past relevant work history as claimant.  (R. 418).  The ALJ and VE further assumed that the hypothetical person had the exertional capacity for unskilled light or sedentary work, with certain limitations including only occasional climbing, balancing and stooping, and no exposure to unprotected heights.  (*Id.*).  VE Gustafson opined that the hypothetical person could perform claimant's past work as a fast food worker, which is essentially a cashier in a fast food restaurant.  (R. 419).  The VE determined that the hypothetical person could also work as a hotel room cleaner (16,030 available positions in the State of Illinois), unskilled cashier (40,662 positions), unskilled interviewer (4,131 positions), general office clerk (7,944 positions), and noted that these positions fall under the category of "light."  (*Id.*).  VE Gustafson further opined that the hypothetical person could perform the following sedentary jobs: telephone interviewer (1,433 positions), messenger (7,078 positions), and unskilled general office clerk (2,889 positions).  (*Id.*).  The VE noted that the hypothetical person could perform certain manufacturing jobs, including production inspector (4,000 light positions and 600 sedentary positions).  (*Id.*).

In response to a question from claimant's attorney, the VE opined that limiting the hypothetical person to one and two step operation would preclude claimant's past work as a fast food cashier and car wash attendant.  (R. 420).  This limitation would also rule out other jobs in the national economy "that are going to involve dealing with data or people, and the one and two step type jobs [that remain available] are going to be dealing with things only."  (R. 420).  The VE concluded that, if limited to one and two step operations, claimant could perform "manufacturing jobs," specifically "[t]he hotel room cleaner, the production inspector, and the hand assembler."  (R. 420-21).  The VE

testified that these jobs require frequent bilateral reaching.  (R. 422).  He opined that, generally, employers would not tolerate absences "exceeding two days per month on an ongoing basis."  (R. 422-23).  According to the VE, employers "will tolerate more than that if it is on a short term, but if it is going to be over an extended time not exceeding twice per month."  (R. 423).  Finally, VE Gustafson confirmed that employers would not allow an employee to lie down during the day if needed for pain management.  (*Id.*)

## III.    LEGAL STANDARD

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).  In reviewing the ALJ's decision, this Court must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Id.*  The ALJ need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Rather, the ALJ must sufficiently articulate her assessment of the evidence to "assure us that the ALJ considered the important evidence [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

### B.    Analysis Under the Social Security Act

In order to qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, an ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon*, 270 F.3d at 1176; 20 C.F.R. § 404.1520.  The claimant has the burden of establishing a disability at steps one through four.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  If claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five-step analysis.  (R. 16-23).  At step one, ALJ Jordan found that Martinez had not engaged in substantial gainful activity since September 8, 2004.  (R. 18).  The ALJ found, at step two, that Martinez's depression and arthritis are severe impairments. (*Id.*).  Next, at step three, the ALJ determined that claimant does not have an impairment or a combination of impairments that meets or medically equals any listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing").

18

(*Id.*). The ALJ found that claimant had the RFC to perform light, unskilled work, but was limited to occasional climbing, balancing, and stooping, and should not be exposed to unprotected heights. (R. 20). ALJ Jordan also found claimant's statements regarding her pain and fatigue were out of proportion to the objective physical findings and not entirely credible. (R. 20-21). At step four, the ALJ determined that Martinez was able to perform her past relevant work as a fast food cashier and/or car wash attendant. (R. 22). ALJ Jordan further determined, at step five, that claimant could perform other jobs in the national economy. (*Id.*). Thus, the ALJ concluded that claimant had not been under a disability as defined in the Act since September 8, 2004, the date she filed her application for benefits. (R. 23).

Claimant asks this Court to reverse the ALJ's decision. Martinez contends that reversal is warranted because ALJ Jordan "disregarded or misconstrued significant items of medical evidence," including Dr. Aruguete's treatment records. Claimant also contends that the ALJ failed to include her manipulative limitations in the RFC finding, did not credit her testimony regarding her pain and related limitations, and erroneously determined that she led a "very active lifestyle." We begin with claimant's arguments regarding ALJ Jordan's consideration of the medical evidence.

IV.    **LEGAL ANALYSIS**

A.    **Substantial Evidence Supports the ALJ's Step Three Determination**

Martinez contends that the ALJ discussed only those portions of the medical record that favor her ultimate conclusion, and failed to consider "significant items of medical evidence" that support a finding of disability. *See, e.g. Brindsi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (remanding where the ALJ conducted a "perfunctory

analysis" and failed to discuss conflicting evidence). The regulations require the ALJ to evaluate every medical opinion offered in support of a claim for disability benefits. 20 C.F.R. § 404.1527(d). If a treating source's opinion is not given "controlling weight," the ALJ must provide "good reasons" for the weight given to that opinion. 20 C.F.R. § 404.1527(d)(2); *see also Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir 2009) (holding that the regulations require that the ALJ give the opinions of a treating source controlling weight).

Martinez challenges the ALJ's determination that she did not meet the requirements of the arthritis listing. Claimant contends that the ALJ ignored medical records that "document problems in the upper extremities." To support this contention, claimant relies on Dr. Hirsen's observation of "trace swelling" and inflammation, Dr. Aruguete's notes of swelling in the hands and fingers, and Dr. Francis' diagnosis of limitations in finger flexion and carpal tunnel syndrome. (R. 244, 332-33, 359-66). Claimant also relies on *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994), to support the proposition that "[t]he fact that the evidence concerning a specific impairment may be sparse does not permit the ALJ to simply disregard the impairment."

The ALJ did not disregard evidence of claimant's arthritis. To the contrary, ALJ Jordan recognized that "[i]n response to complaints of musculoskeltal aches and pains the claimant's treating doctor [Dr. Aruguete] referred her to a board certified rheumatologist [Dr. Hirsen]." (R. 21). She also noted that "Dr. Hirsen . . . detected very subtle evidence of an inflammatory process. He describes it as not well developed, and notes that [t]he laboratory tests and physical examination were normal. He suggested that she take a long acting anti-inflammatory." (*Id.*). Claimant argues, without sufficient

explanation, that the ALJ misconstrued the aforementioned medical findings. We do not credit this argument.

As the Seventh Circuit has instructed, "[t]o meet or equal a listed impairment, the claimant must satisfy all the criteria of the listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (affirming district court's denial of claim for disability insurance benefits where claimant failed to provide medical evidence showing that his condition met or equaled the listing); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). ALJ Jordan recognized that arthritis is a musculoskeletal impairment that falls under Listing 1.02, which covers the major dysfunction of a joint(s) due to any cause. (R. 18). To meet the requirements of that listing, claimant had to show that her arthritis is "[c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), *and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).*" Listing 1.02 (emphasis added); *see also* 20 C.F.R. § 404.1526(a) (stating that an impairment "is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment"). However, claimant's medical record does not contain any x-ray, MRI, or other medical image documenting joint space narrowing, bony destruction, ankylosis, or other problems in claimant's upper extremities. Moreover, as defendant persuasively argues in its response brief, claimant has not shown that ALJ Jordan disregarded any significant opinion, or otherwise failed to recognize her joint pain and hand problems. *See Dixon,* 270 F.3d at 1176 (holding that an ALJ "is not required to address every piece of evidence or testimony, but must provide some glimpse into [his]

21

reasoning.") (quotations omitted).

Martinez also contends that ALJ Jordan ignored evidence of her depression and periods of decompensation. That condition is covered by Listing 12.04. ALJ Jordan correctly recited the requirements of that listing and concluded that the medical evidence claimant submitted in support of Martinez's claim for benefits did not show marked restrictions of daily living, "repeated episodes of decompensation, each of extended duration," or other criteria necessary to meet or equal the listing. (R. 19). Claimant contends that remand is warranted because the ALJ "rejects, without any explanation, Dr. Lanier's conclusion that [she] . . . had episodes of decompensation." This Court disagrees.

ALJ Jordan found that "claimant has experienced no episodes of decompensation." (R. 19). This observation is consistent with claimant's treatment records after the alleged onset date. Dr. Lanier noted "one or two" episodes of decompensation within an undisclosed time frame in his RFC assessment. (R. 298). Like the ALJ, Dr. Lanier opined that claimant's condition did not meet or medically equal the listing for organic mental or affective disorders. (R. 299). Although claimant has shown that she attempted suicide several times prior to 2002, she has not presented any evidence of repeated episodes of decompensation of an extended duration after that time. Moreover, substantial evidence in the record supports ALJ Jordan's determination. For example, Dr. Baukus, the DDS psychiatrist who examined claimant, diagnosed "chronic depression in partial remission with psychiatric treatment." (R. 284). Dr. Fyans also found that claimant's depression was in remission with treatment, and that she did not demonstrate the presence of Listing 12.04 "C" criteria. (R. 306, 317).

As the ALJ observed, "[i]t has been many years since the claimant has required hospitalization for a psychiatric illness, and has not required the services of a psychiatrist for outpatient therapy." (R. 19). Claimant concedes that she did not receive psychiatric treatment for her depression, but argues that this is excused by the difficulties in obtaining affordable treatment. While this Court is sympathetic to claimant's financial constraints, they do not relieve her of the burden to produce supporting medical evidence. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty.").

### B. The ALJ's Credibility Analysis Is Not Patently Wrong

Next, Martinez contends that the ALJ erred in her credibility analysis. ALJ Jordan found that Martinez's complaints of severe pain and fatigue were "out of proportion to the objective physical findings, and this inconsistency reflects negatively on her credibility." (R. 21-22). Claimant argues that remand is warranted because the ALJ relied on "a number of things" that do not support this conclusion, "either logically or based on the evidence in this case." To succeed on this argument, Martinez must overcome the highly deferential standard that we accord credibility determinations. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference). Because the ALJ is in a superior position to assess the credibility of a witness, this Court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007).

Martinez contends, without citing to supporting authority or specific records, that

the ALJ improperly relied on medical evidence that pre-dates her alleged onset date in the credibility analysis.  Claimant elaborates on this argument in her reply brief, and identifies the impermissible evidence as involving her past suicide attempts and 2003 surgeries.  Martinez further asserts that the "point is that it is inherently unfair to determine that circumstances that pre-date the relevant time period do not constitute disabling conditions and use that conclusion to diminish [claimant's] credibility."

Claimant's argument ignores the ALJ's obligation to consider "all of the evidence presented."  20 C.F.R. § 404.1529(c)(3).  This includes "statements or reports . . . about [claimant's] medical history, diagnosis, prescribed treatment, daily activities [and] efforts to work."  20 C.F.R. § 404.1529(a); *see also Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) ("If the allegation of pain is not supported by the objective medical evidence . . . then the ALJ . . .  must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.").  Thus, in making her credibility determination, ALJ Jordan was required to consider all of the evidence claimant submitted in support of her claim for benefits, including the evidence related to her condition prior to 2003.  Her consideration of that evidence cannot be "patently wrong."  *See, e.g. Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (holding that ALJ's credibility determination that took into account the "entire case record" was not patently wrong).

Claimant also challenges the ALJ's statement that she was "able to maintain a very active lifestyle in the process of caring for her five children."  Claimant argues that ALJ Jordan's conclusion is not supported by the record, which "indicates exactly the opposite."  *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (remanding where

24

the ALJ attached great significance to claimant's ability to care for her personal needs and those of her two small children, but did not mention uncontested evidence showing that she performed those tasks with difficulty, and with outside assistance). We agree that the record contains evidence that may contradict the ALJ's observation. However, because the record as a whole supports the ALJ's credibility assessment, we decline to remand on this basis. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (affirming the denial of benefits even though "[s]ome of the ALJ's findings regarding [claimant's] credibility [we]re a bit harsh").

As the Seventh Circuit has explained, "an ALJ's credibility assessment will stand as long as there is some support in the record." *Id.* at 546 (quotation omitted). Here, ALJ Jordan reviewed the testimony and medical records before determining that Martinez's "complaints of severe musculoskeletal pain and severe fatigue . . . are out of proportion to the objective physical findings." (R. 21). The ALJ explained her finding by citing specific medical opinions, including Dr. Hirsen's finding of "subtle evidence" of an inflammatory process that was "not well developed." (*Id.*). ALJ Jordan heard extensive testimony from Martinez regarding her daily activities, which included taking care of her own personal hygiene, caring for her five children, preparing meals, taking walks for exercise, doing laundry and cleaning the house. *See* 20 C.F.R. § 404.1529(c)(3)(i) (requiring consideration of a claimant's "daily activities" in connection with the credibility analysis). Claimant's statements to Dr. Baukus regarding her ability to independently take care of her activities of daily living further support the ALJ's credibility determination. (R. 282). Accordingly, this Court is not persuaded that the ALJ's credibility determination is "patently wrong." *See Sims v. Barnhart*, 442 F.3d 536, 538

(7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.") (citations omitted).

### C.    The ALJ Included Claimant's Limitations in the RFC Analysis

Next, Martinez contends that the  ALJ did not apply claimant's manipulative and mental limitations to the RFC finding.  An RFC is "that which a claimant can still do despite her physical and mental limitations."  *Clifford v. Apfel*, 227 F.3d 863, 873 n. 7 (7th Cir. 2000).   ALJ Jordan determined that claimant had the RFC to perform light work with certain limitations, including jobs that are "unskilled."  (R. 20).  We must determine if this finding is supported by substantial evidence.  *See, e.g. Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002) (affirming the determination that claimant could perform light work where supported by substantial evidence).

Claimant argues that the ALJ erroneously determined she was "able to use her hands for fine and gross manipulations."  (R. 19).  Again relying on the Seventh Circuit's decision *Herron*, Martinez argues that ALJ Jordan violated her duty to consider all of the evidence of claimant's impairments.  19 F.3d at 333.  In *Herron*, the ALJ dismissed claimant's hand impairment without explanation, despite evidence supporting a diagnosis of sarcoidosis, a multi-system inflammatory disease.  *Id.* at 333-34.  Those facts are not present here.  ALJ Jordan considered the limited record evidence related to claimant's swelling and joint pain in connection with the RFC, and noted claimant's "mild" arthritis and related restrictions.  (R. 19-22).  As discussed above, claimant has not identified any medical opinion or other evidence of function limitations related to her hands or fingers that ALJ Jordan failed to consider.  In fact, none of claimant's treating

26

physicians found that she had greater limitations due to physical or mental problems than those found by the ALJ.

Martinez further argues that the ALJ rejected, without explanation, Dr. Lanier's conclusions that she had episodes of decompensation and was limited to one and two step directions. In fact, Dr. Lanier concluded that claimant could "carry out *at least* one and two step directions." She also found that claimant could perform substantial gainful activity. (R. 298, 304). Claimant states, in her reply brief, that "the VE's testimony makes it clear" that Dr. Lanier's conclusions "differed" from the ALJ's determination that claimant could perform unskilled work. This distinction is not clear to the Court.

As defendant persuasively argues in its response, the record does not contain any other medical evidence regarding the alleged limitation. The ALJ noted in her opinion that the regulations classify repeated episodes of decompensation as three (or more) episodes within a year, each lasting for at least two weeks. (R. 19). Such episodes are not shown in claimant's medical records. Accordingly, and because substantial evidence supports ALJ Jordan's RFC analysis, we decline to remand this matter for further consideration. *See Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003) (affirming denial of benefits where ALJ disregarded evidence of "somewhat poor" concentration on the grounds that the record as a whole supported the determination that claimant had the RFC to perform his past relevant work).

Finally, claimant contends that ALJ Jordan's step four determination cannot stand because the ALJ failed to include claimant's mental limitations in her questions to VE Gustafson, and therefore impermissibly relied on the VE's testimony. As discussed above, claimant did not present sufficient evidence to support the proposed limitations.

Accordingly, the ALJ was not required to apply those limitations at the fourth or fifth step of the analysis.

**V.      CONCLUSION**

For the reasons set forth above, this Court finds that the Social Security Agency's decision to deny Martinez's request for benefits is supported by substantial evidence in the record. Accordingly, the Commissioner's motion for summary judgment is granted and claimant's motion is denied. It is so ordered.

                        **ENTERED:**


                        _____
                        **MICHAEL T. MASON**
                        **United States Magistrate Judge**


**Dated: February 24, 2010**